UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. ORLANDO DONES-VARGAS, a/k/a "Landy," Defendant. | 4:17-CR-40086-01-KES ORDER DENYING MOTION FOR NEW TRIAL |

Defendant, Orlando Dones-Vargas, moves for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. Docket 87. Specifically, Dones-Vargas alleges that the government failed to disclose law enforcement payments to a cooperating witness in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See id.* at 7-9. Plaintiff, the United States, opposes the motion. Docket 91. On June 25, 2018, the court held an evidentiary hearing on Dones-Vargas's motion. Docket 96. For reasons that follow, the court denies the motion for a new trial.

## BACKGROUND

Following a jury trial on January 29 and 30, 2018, the jury convicted Dones-Vargas of one count of conspiracy to distribute methamphetamine and one count of possession with intent to distribute methamphetamine.

Dockets 36, 67. In total, nine witnesses testified for the government at Dones-Vargas's trial. *See* Docket 68 (minutes from trial). Two of those witnesses were Margaret Ghost and Detective John Spaeth. *Id.* at 2-3.

## I. Testimony at Trial

At Dones-Vargas's trial, Ghost testified that she was his long-time girlfriend and that Dones-Vargas was the father of her four children. Docket 93 at 4-5 (transcript of Ghost's trial testimony). Ghost further testified that she and Dones-Vargas dated for over six years. *Id.* At the time of trial, Ghost testified that she was being housed at the Yankton County Jail in Yankton, South Dakota. *Id.* at 3. Prior to being housed at the Yankton County Jail, Ghost was housed at the South Dakota's Women's Prison in Pierre, South Dakota. *Id.* Ghost was in prison because she had violated her parole for a pair of 2014 convictions. *Id.*

Most of Ghost's trial testimony was about instances where she observed Dones-Vargas's involvement in distributing methamphetamine in South Dakota during the six-plus years that they were together. *See id.* at 4-15, 18-19. Specifically, Ghost testified to observing Dones-Vargas sell methamphetamine to over 30 people. *Id.* at 8. Many of these sales took place in Sioux Falls, South Dakota. *Id.* at 10-12. Although Dones-Vargas never sold methamphetamine to Ghost, she testified that he would regularly provide her with methamphetamine so she could get high. *See id.* at 6-7.

Ghost also testified at trial about instances where she observed Dones-Vargas purchase and transport methamphetamine. *See id.* at 12-14. The

2

purchases Ghost observed took place in Vermillion, South Dakota, at a home with a yellow Hummer. *Id.* at 12-13, 19. Ghost further testified that when Dones-Vargas transported methamphetamine, he would remove the front passenger console, place the methamphetamine above the console, and then put the console back into the car. *Id.* at 13. Dones-Vargas then transported the methamphetamine to a storage locker in Sioux Falls. *Id.* at 13-14. According to Ghost, the largest amount of methamphetamine that she witnessed Dones-Vargas possess at one time was four pounds. *Id.* at 19. Ghost also testified that she expected to receive nothing from the government for testifying against Dones-Vargas. *Id.* at 20-21.

Ghost was not the only witness who testified at trial regarding Dones-Vargas's distribution and possession of methamphetamine. Three other witnesses testified at trial regarding their interactions with Dones-Vargas in distributing methamphetamine. One of these witnesses, Jose Riveraperez, testified regarding his personal involvement with Dones-Vargas in distributing methamphetamine. *See* Docket 68. Riveraperez specifically testified that he purchased methamphetamine from Dones-Vargas, that he helped Dones-Vargas sell methamphetamine to others by translating from English to Spanish for Dones-Vargas, that he observed Dones-Vargas trade guns for methamphetamine, and that he observed Dones-Vargas pay over $1,000 to purchase methamphetamine.

Witness Blanca Luna-Soto also testified at Dones-Vargas's trial. *See id.* Luna-Soto testified about a meeting that she and her boyfriend, Edras Chua-

3

Lemus, had with Dones-Vargas in Vermillion where the three of them discussed the possibility of Dones-Vargas purchasing drugs from Luna-Soto and Chua-Lemus. Luna-Soto also testified regarding two instances—one outside a restaurant in Sioux Falls and one in Vermillion at her and Chua-Lemus's home—where Dones-Vargas purchased three to four pounds of methamphetamine from them. On another occasion, Luna-Soto testified that she and Chua-Lemus sold methamphetamine to Dones-Vargas while in Vermillion in exchange for a Dodge Mangum.

Chua-Lemus's trial testimony corroborated Luna-Soto's trial testimony. Specifically, Chua-Lemus testified about the meeting he and Luna-Soto had with Dones-Vargas in Vermillion while discussing the sale of methamphetamine to Dones-Vargas, that he and Luna-Soto sold Dones-Vargas methamphetamine outside of a restaurant in Sioux Falls, that Dones-Vargas traded them a Dodge Magnum for methamphetamine, and that Dones-Vargas came to their home in Vermillion to purchase methamphetamine. Chua-Lemus also corroborated Ghost's trial testimony when he testified that he owned a yellow Hummer that he kept at his residence in Vermillion. Chua-Lemus testified that Dones-Vargas had his girlfriend with him during this sale of methamphetamine. In addition to corroborating the testimony of other witnesses, Chua-Lemus testified about other instances where he sold methamphetamine to Dones-Vargas. On one of these occasions, according to Chua-Lemus, Dones-Vargas paid him $12,000 for one pound of methamphetamine at a hotel in Sioux Falls.

4

Detective John Spaeth of the Sioux Falls Police Department also testified at Dones-Vargas's trial. Detective Spaeth is a member of the Sioux Falls Area Drug Task Force and was involved in the investigation into Dones-Vargas. Specifically, Detective Spaeth testified that he began investigating Dones-Vargas in 2013 and surveilled him at three different residences. Detective Spaeth also testified that during the course of his investigation, he observed Dones-Vargas driving ten different vehicles. In August 2017, Detective Spaeth interviewed Dones-Vargas following his arrest and was involved in the search of Dones-Vargas's vehicle by law enforcement. Detective Spaeth testified that Dones-Vargas was released on bond after his August 2017 interview, but was re-arrested on September 13, 2017, after Dones-Vargas was indicted on the present federal charges. During this arrest, as Detective Spaeth testified, law enforcement found more than $1,000, multiple cell phones, and multiple MoneyGram receipts in Dones-Vargas's vehicle.

## II. Evidence Discovered After Trial

After Dones-Vargas's trial was completed, Dones-Vargas learned for the first time that his ex-girlfriend Ghost had previously acted as an informant for law enforcement. *See* Docket 89 at 1 (affidavit from Dones-Vargas's attorney); *see also* Docket 88 (Ghost affidavit). Dones-Vargas also learned that Ghost had provided information to law enforcement in relation to Dones-Vargas's case and that she was paid for providing this information. *See* Docket 89 at 1. This information was not disclosed to Dones-Vargas in discovery, nor did counsel for the government inquire as to whether Ghost was paid for the information

5

she provided to law enforcement. Docket 89 at 1; Docket 91 at 3-4 (government's memorandum in opposition).

According to Ghost's affidavit, prior to being sentenced to prison in 2014, she provided information on certain individuals to the Sioux Falls Area Drug Task Force and specifically to Detective Spaeth. Docket 88 ¶ 3. In return for this information, Detective Spaeth paid Ghost for providing information on individuals whom she knew were using and selling drugs in the Sioux Falls area. *Id.* ¶ 4. In late 2017, Detective Spaeth approached Ghost while she was at the Women's Prison in Pierre and asked if she would testify against Dones-Vargas at trial. *Id.* ¶ 5. Ghost claims that she agreed to testify at Dones-Vargas's trial because she was upset at him for cheating on her and not being around after their twin children were born. *Id.* ¶ 6.

After the jury convicted Dones-Vargas, but while Ghost was still being housed at the Yankton County Jail, Ghost claims that she was contacted by Detective Spaeth who asked her if she needed anything. *Id.* ¶¶ 8-10. In response, Ghost alleges that she told Detective Spaeth that she "could use some money on [her] 'books.' " *Id.* ¶ 10. Detective Spaeth then placed $150.00 in Ghost's account at the jail on January 31, 2018. *Id.* ¶ 11; Docket 87-1 at 3 (Ghost's resident transaction details from the Yankton County Jail).

At the evidentiary hearing, Detective Spaeth testified that he first met Ghost in 2013 when she contacted him about providing information on individuals selling drugs in Sioux Falls. In 2015, according to Detective Spaeth, Ghost provided him with information about Dones-Vargas. The next time Ghost

provided information to Detective Spaeth was in 2016. This time the information that Ghost provided to Detective Spaeth related to multiple individuals, one of which was Dones-Vargas. In 2017, Ghost again provided information to Detective Spaeth related to Dones-Vargas. Some of this information was reduced to a report that was provided to Dones-Vargas in discovery. In total, according to Detective Spaeth, Ghost provided him with information on 11-15 different people.

Prior to Dones-Vargas's trial, Detective Spaeth issued two payments to Ghost. The first payment was for $100.00 and was issued by Detective Spaeth on November 1, 2017. *See* Docket 97, Exhibit 1. The reason for this payment, according to Detective Spaeth, was two-fold. First, the payment represented all of the information that Ghost had provided to that date. Second, the payment was issued because Ghost had asked Detective Spaeth for money to help pay for personal items following the birth of her and Dones-Vargas's twin children. On November 8, 2017, Detective Spaeth issued a $150.00 payment to Ghost. *See id.*, Exhibit 2. The reason for this payment was because Ghost had provided information that led to the arrest of a suspect unrelated to Dones-Vargas. Neither of these payments were disclosed to Dones-Vargas in discovery.

After November 2017, Detective Spaeth had occasional contact with Ghost. Most of these contacts were initiated by Ghost, who was seeking updates on Dones-Vargas's case. Detective Spaeth was also present with others for Ghost's trial preparation meeting in early January of 2018. According to Detective Spaeth, there was no discussion of paying Ghost for her testimony at

this meeting. Detective Spaeth further testified at the evidentiary hearing that he never reached an agreement with Ghost to pay her for her testimony against Dones-Vargas.

Detective Spaeth next spoke to Ghost a couple of days after Dones-Vargas's trial. The reason for this communication, according to Detective Spaeth, was because Ghost had called him to provide information on drug activities unrelated to Dones-Vargas that were going on in Yankton. Ghost also informed Detective Spaeth that she had no money to pay for personal items while in jail. In response to his conversation with Ghost, Detective Spaeth had $150.00 added to Ghost's account on January 31, 2018. *See* Docket 87-1 at 3; Docket 97, Exhibit 3.

## LEGAL STANDARD

Under Rule 33 of the Federal Rules of Criminal Procedure, a court can vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[T]he standard in [the Eighth Circuit] for a Rule 33 motion is clear and binding." *United States v. Rubashkin*, 655 F.3d 849, 858 (8th Cir. 2011). "The rule requires that the newly discovered evidence 'probably will result in an acquittal.'" *Id.* (emphasis omitted) (quoting *United States v. Baker*, 479 F.3d 574, 577 (8th Cir. 2007)).

In ruling on a Rule 33 motion, district courts have broad discretion and "can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict[.]" *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002) (citation omitted). "Nevertheless, this broad

8

discretion should be exercised 'sparingly and with caution.' " *United States v. Schropp*, 829 F.3d 998, 1005 (8th Cir. 2016) (quoting *Campos*, 306 F.3d at 579). "Unless the district court ultimately determines that a miscarriage of justice will occur, the jury's verdict must be allowed to stand." *Campos*, 306 F.3d at 579.

## ANALYSIS

Dones-Vargas argues that he is entitled to a new trial because the government violated his due process rights as defined in *Brady*, by failing to disclose the payments made to Ghost both before and after his trial. Docket 87 at 7. Specifically, Dones-Vargas contends that the "entire trial would have been different if the jury had known that money had been the motivating factor for the testimony of Margaret Ghost." *Id.*

"There are three components to a *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory or has impeachment value; the [government] must have suppressed the evidence, either willfully or inadvertently; and prejudice must have resulted." *Kennell v. Dormire*, 873 F.3d 637, 639 (8th Cir. 2017) (citation omitted). "Prejudice results if the suppressed evidence is material, which for *Brady* purposes occurs 'when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different,' or in other words, when the evidence 'undermines confidence in the outcome of the trial.' " *Id.* (quoting *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017)). The protections afforded by *Brady* apply "even when the defendant does not specifically request the

9

covered information." *United States v. Sigillito*, 759 F.3d 913, 929 (8th Cir. 2014).

Here, the United States concedes that $250.00 in pre-trial payments should have been disclosed to Dones-Vargas. Docket 91 at 5-6. But the United States argues that the impact of the nondisclosure is not material given the overwhelming evidence that was presented against Dones-Vargas at trial. *Id.* The United States specifically identifies the testimony from cooperating witnesses such as Riveraperez, Luna-Soto, and Chua-Lemus as evidence that independently would be sufficient to find guilt and uphold the jury's verdict. *See id.*

The United States did not address in its brief whether the post-trial payment of $150.00 needed to be disclosed but took the position at the evidentiary hearing that it did not have a duty to disclose the post-trial payment because the Eighth Circuit has yet to extend the protections of *Brady* into the post-trial context. The United States further argued that evidence of the payment could not have impacted the verdict *at trial* because the payment was made after the trial had finished. Dones-Vargas counters this argument by relying on the Supreme Court's statement in *Imbler v. Patchman*, 424 U.S. 409, 427 n.25 (1976), that "after a conviction the prosecutor also is bound by the ethics of his office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction." *Cf. Fields v. Wharrie*, 672 F.3d 505, 515 (7th Cir. 2012) ("[A] prosecutor's *Brady* and *Giglio* obligations remain in full effect on direct appeal and in the event of

10

retrial because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness."). Thus, although the Eighth Circuit does not appear to have addressed the question of whether a prosecutor's responsibilities under *Brady* extend until a defendant's conviction is final, the court will assume for Dones-Vargas's benefit that the post-trial payment to Ghost of $150.00 should have been disclosed to him by the government.

Having reviewed the evidence and testimony submitted both at the evidentiary hearing and at trial, the court concludes that Dones-Vargas has satisfied the first two prongs of the *Brady* analysis. First, the fact that Ghost was paid $250.00 for providing information to law enforcement on Dones-Vargas and others in the past and that she was given $150.00 after Dones-Vargas's trial had finished, is information that is favorable to Dones-Vargas. Second, it is undisputed that information regarding these payments was suppressed. Although it appears the suppression of the information was inadvertent, whether the suppression of favorable information was made in good faith or bad faith is immaterial for purposes of the *Brady* analysis. *United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016) ("Under *Brady v. Maryland*, 'suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " (quoting *Brady*, 373 U.S. at 87)).

While Dones-Vargas has satisfied the first two prongs of the *Brady* analysis, his claim fails at the third prong because he cannot show that he was prejudiced by the nondisclosure of the payments to Ghost. In order to demonstrate that he was prejudiced, Dones-Vargas would need to show that "the government's failure to disclose [the information] undermines confidence in the outcome of the trial." *White v. Steele*, 853 F.3d 486, 490 (8th Cir. 2017) (quotation omitted). And in light of the other testimony and evidence presented at Dones-Vargas's trial, the court concludes that the government's failure to disclose the $400.00 in payments to Ghost in this case does not undermine confidence in the jury's verdict.

Supporting the court's conclusion are the Eighth Circuit's recent decisions in *Kennell* and *White*. In *Kennell* and *White*, which share a factual background,[1] the Eighth Circuit had to decide whether the State of Missouri violated *Brady* by failing to disclose "that it had paid Shockley around two thousand dollars to put him up in a hotel for about a week and then to move

---

[1] The relevant factual background for *Kennell* and *White* is as follows:

> Some years ago, three men armed with guns stopped near the house of one Freddie Chew where Chew, Jeffrey Shockley, and Robert Stewart were gathered. A shootout erupted, resulting in Chew's death. Shockley and Stewart escaped and later identified Juane Kennell and Christopher White as two of the three attackers. Kennell and White were tried separately in Missouri state court on charges of first-degree murder, first-degree assault, and armed criminal action, and both were convicted, thanks in large part, probably, to testimony from Shockley and Stewart.

*Kennell*, 873 F.3d at 638.

12

him and his mother into a different apartment." *Kennell*, 873 F.3d at 639-40; *see also White*, 853 F.3d at 491-92. In concluding that the failure to disclose these payments did not undermine confidence in the juries' verdicts, the Eighth Circuit noted that the reason for the relocation payments was because Shockley had received threats. *White*, 853 F.3d at 492; *Kennell*, 873 F.3d at 640. In fact, as the *White* and *Kennell* courts noted, disclosure of these payments to the jury actually could have harmed the defenses at trial because the evidence that Shockley received threats could have invited testimony or speculation by the jury that White and Kennell were attempting to prevent Shockley from testifying at trial. *See White*, 853 F.3d at 492; *Kennell*, 873 F.3d at 640. The Eighth Circuit also noted that the timing of these payments—more than one year prior to Kennell's trial and more than two years prior to White's trial—made it unlikely that they impacted Shockley's willingness to testify at the respective trials. *White*, 853 F.3d at 492; *Kennell*, 873 F.3d at 640.

Dones-Vargas attempts to distinguish *White* and *Kennell* by noting that the payments to Shockley were made long before the trial took place. Docket 95 at 1-2. The payments to Ghost, on the other hand, were made less than two months before the trial began and within two days after the trial had completed. *Id.* Dones-Vargas also notes that the payments in *White* covered things such as housing assistance and food vouchers. *Id.* at 2 (citing *White*, 853 F.3d at 492). But the purpose for the payments to Ghost, according to Dones-Vargas, was to reimburse her for information she provided law enforcement. *Id.*

13

While Dones-Vargas is correct that the payments here were made closer to the trial than were the payments in *Kennell* and *White*, disclosure of the payments to the jury does not undermine confidence in the jury's verdict at trial. Two considerations are important in the court's view. First, the payments here total $400.00, an amount that is substantially lower than the $2,000.00 payments in *Kennell* and *White*.[2]

Second, the other evidence presented at trial was sufficient to support the jury's conclusion that Dones-Vargas was part of a conspiracy to distribute methamphetamine and that Dones-Vargas had possession of methamphetamine with the intent to distribute it. At the evidentiary hearing, Dones-Vargas argued that Ghost's testimony was the "glue" that corroborated the testimony of all the other witnesses. In the court's view, however, there was sufficient testimony from the other witnesses to demonstrate that Dones-Vargas was party to the conspiracy to distribute methamphetamine and that Dones-Vargas was in possession of methamphetamine with the intent to distribute it. Specifically, the testimony of Riveraperez, Luna-Soto, and Chua-Lemus all supported the jury's conclusion that Dones-Vargas conspired to sell methamphetamine and possessed methamphetamine with the intent to distribute it. Also significant are the facts that when Dones-Vargas was

---

[2] As indicated above, only $250.00 of the payments to Ghost were made prior to Dones-Vargas's trial and it is unclear whether the United States had a duty to disclose the $150.00 payment made after Dones-Vargas's trial had completed. But even assuming the United States did have the duty to disclose that payment, the additional $150.00 payment does nothing to lessen other evidence that was presented against Dones-Vargas at trial.

arrested and booked in early August 2017, law enforcement found 13.7 grams of methamphetamine hidden in his underwear and when he was arrested later that same month law enforcement found over $1,000, multiple cell phones, and multiple MoneyGram receipts in his vehicle. Thus, after considering all of the evidence presented at trial and at the evidentiary hearing, the court concludes that the United States's failure to disclose the $400.00 in payments to Ghost does not undermine confidence in the jury's verdict at trial. *See White*, 853 F.3d at 492; *Kennell*, 873 F.3d at 640.

## CONCLUSION

Dones-Vargas has satisfied the first two prongs of the *Brady* analysis to demonstrate that the United States suppressed material evidence in his trial. But Dones-Vargas has failed to satisfy the third prong of *Brady* to show that the disclosure of the payments to Ghost would undermine confidence in the jury's verdict at trial. Thus, it is

ORDERED that Dones-Vargas's motion for a new trial (Docket 87) is denied.

IT IS FURTHER ORDERED that Dones-Vargas's sentencing hearing will be held on **Monday, July 16, 2018, at 1:00 p.m.** in Courtroom 2 of the Federal Building, 400 South Phillips Avenue, Sioux Falls, South Dakota. Letters of support and all other presentence-related documents are due on or before Thursday, July 12, 2018. All other dates from the court's prior

15

scheduling order (Docket 78) remain in effect unless specifically changed herein.

DATED July 5, 2018.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE